# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

NICHOLAS LOVELADY

   Plaintiff,

     v.                          Civ. No. 8:21-CV-2054-MSS-AEP
                                             JURY TRIAL DEMANDED

COGNIZANT TECHNOLOGY
SOLUTIONS U.S. CORPORATION

   Defendant.

_____

## PLAINTIFF NICHOLAS LOVELADY'S AMENDED COMPLAINT

Plaintiff Nicholas Lovelady, by and through his undersigned attorney, alleges the following:

### **INTRODUCTION**

1.    This suit seeks to redress unlawful and tortious conduct in the technology industry. The Defendant, Cognizant Technologies Solutions (Cognizant), made a series of misrepresentations to engage and maintain the Plaintiff's employment. Cognizant did this at the expense of Plaintiff's health and dignity, subjecting him to severe emotional distress.

2.    Through its representatives, the Defendant used fraudulent and/or negligent misrepresentations to actively conceal the nature of its business and work. Cognizant issued false and misleading job descriptions, and then orchestrated a simulated interview process to engage the Plaintiff's employment.

It also misled him with references to family, community, and mental health to maintain his work product. The Plaintiff reasonably relied on these misrepresentations, which resulted in extreme, life-altering trauma.

3.     Cognizant also operated a dangerous and manipulative environment designed to stifle dissent, intimidate workers, and block access to mental health resources. The Defendant did this in an unsanitary workspace, where it subjected human beings, including the Plaintiff, to horrific and unspeakable content. Using calculated leverage, Cognizant intentionally and recklessly caused the Plaintiff severe emotional distress.

4.     Initially, the Plaintiff was one of several parties to file suit in Aaliyah Aguilo, et al. v. Cognizant Technology Solutions U.S. Corporation (Case No: 8:21-cv-2054-MSS-AEP). After the Court dismissed the action without prejudice, Mr. Lovelady is re-filing prior to the stated deadline (November 14, 2023) as a singular Plaintiff to vindicate his rights under Florida law.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332. The Plaintiff is a Florida resident and citizen, and the Defendant, a Delaware Corporation and citizen of that State. The Plaintiff seeks recovery of damages in excess of $75,000.00.

6.     Venue is proper under 28 U.S.C. § 1391(b)(2) as the events giving rise to this action occurred in Hillsborough County, Florida.

## PARTIES

### Plaintiff

7.      The Plaintiff is a 40-year-old Florida resident and former Cognizant employee. Born with two genetic disabilities, Multiple Osteochondromas (MO) and cranio-facial Fibrous Dysplasia (FD), he has had over thirty (30) surgeries to address complications from the conditions. The disabilities, and the surgeries themselves, affect the Plaintiff's appearance. He has skeletal differences, asymmetry, and dysplasia throughout his body. As a child, during one particular cranial procedure, surgeons scarred his optic nerve, resulting in full and complete blindness in his left eye. This affects his ability to work in many jobs and navigate daily life.

### Defendant

8.      The Defendant is a Delaware corporation currently headquartered in Texas. It operated a facility in Hillsborough County, Florida where the events giving rise to Plaintiff's claims occurred. Cognizant is in the primary business of third-party contracting and outsourcing. In this specific action, the Defendant maintained a contractual relationship with social media company Facebook, Inc. (Now 'Meta;' for purposes of this pleading, 'Facebook' and 'Meta' will be used interchangeably). As part of the agreement, the Defendant accepted responsibility to monitor, moderate and curate content posted to the Facebook social media site.

## STATEMENT OF FACTS

### Defendant's White Paper

9.     As early as January of 2012, the Defendant promoted cost-savings

and leveraging in the content moderation space. This was done through

advertising materials, including the use of a 'White Paper,' a document designed

to highlight and promote business offerings.

10.     In this material, the Defendant attempted to publicize a potential

price point for personalized content moderation, maintaining that video, audio,

image, and text could be curated at certain touchstones (eg. 1,000 video clips

could be moderated via human intervention for $277.00, Audio clips at $230.00,

Images at $.70, and Text at $167.00). Abhijeet Khadilikar, et al., *How to De-Risk*

*the Creation of and Moderation of User-Generated Content,* Cognizant 20-20

Insights, Jan. 2012, Pages 1-7, at 4.

11.     The Defendant was aware that content could run the gamut

from the inane to potentially graphic and life-altering. The White Paper, however,

did not discuss the hurdles and human cost of this work. Instead, it argued that

human moderation could be 'inefficient.' Cognizant went on to conclude that the

largest challenge wasn't the content itself, but rather, 'scalability.' *Id.* at 5.

### Defendant Contracts with Facebook to Provide Content Moderation

12.     Upon information and belief, in approximately January of 2017, the

Defendant contracted with Facebook, Inc. to outsource moderation for

user-generated content. Estimated terms for the contract included a 2-year duration with $200,000,000.00 in consideration for the service.

13.     Faced with a rapidly growing user base, large swathes of content, and a psychological cost that executives themselves had trouble processing, Facebook employed contracting companies to moderate user postings. *See* Sudhir Venkatesh, *The Garbage Can Model of Decision Making* (2021), https://freakonomics.com/podcast/the-garbage-can-model-of-decision-making/ (Last Accessed 10/22/23)(Discussing the extreme psychological toll Facebook executives paid after being subjected to these videos. High ranking executives cried, cited intense emotional suffering, and still recounted effects even years after they viewed the content).

14.   The process provided an escalation procedure on the Facebook platform. Users reported objectionable material, and human moderators would determine the suitability of content based on internal rules or what Facebook called 'community standards.'

15.     The Facebook and Cognizant 'standards' were not static, and the parties altered them often based on 'novel scenarios' or changing needs.

16.     For its part, the Defendant agreed to maintain a contracting workforce as well as office space for the moderators.

17.     Cognizant also controlled the talent selection process. Specifically, the Defendant agreed to psychologically screen applicants for potential mental health concerns prior to their full-time employment. This was also to come in

tandem with disclosures, notifying potential employees that much of the Facebook content could include objectionable, damaging, and triggering visuals.

18.    Facebook also contracted with Defendant to offer employees consistent education and psychological services. The education component was to support employees as they made complicated decisions on content 'standards' in specific video and fact-sets. The parties anticipated that employees would also develop trauma-induced side effects. They therefore agreed to provide open access to psychological support.

**Defendant Hires Plaintiff As a 'Process Executive'**

19.    In February of 2017, the Defendant began its talent selection process for 'process executive' positions in Phoenix, AZ and Tampa, FL. These labor markets are known to have traditionally lower median incomes and higher unemployment rates. *Employment and Wages, Annual Averages 2017*, U.S. Bureau of Labor Statistics, https://www.bls.gov/cew/publications/employment-and-wages-annual-averages/2017/home.htm (Last Visited 11/1/23).

20.    During this time, the Plaintiff was a working and disabled husband and father. He was the sole economic provider for a household of 4, his wife unable to work, his two children aged 5 and 1-year-old at the time. Doctors had recently diagnosed the Plaintiff's youngest child with autism, as well as the Plaintiff's same genetic disability, MO.

21.    The Plaintiff's work at the time was just above minimum wage, his family living at the poverty line. It was also physically difficult, requiring quick

use of his arms and legs as he maintained the rest of his body in fixed, painful positions. It further required him to consistently rotate his neck and head due to the inability to see from his left eye.

22.     With the Plaintiff's disability, the long term tenability of his work was uncertain. People with MO experience prolonged pain associated with nerve compression, limb bowing, and often large masses throughout their body. Complications from this pain, as well as the strain from pivoting his vision, made work very difficult for the Plaintiff.

23.     Despite hurdles, the Plaintiff had earned a college degree, yet throughout his professional career, found himself consistently under-employed.

24.     This is often the case for disabled people, especially those with visible differences. The average person with a disability is almost 2-times as likely to be unemployed as an able-bodied person. Even if disabled people can earn employment, they often earn less – 40 percent less –  in earnings compared to their able-bodied counterparts. *See* Yin, Michelle et al. '*An Uneven Playing Field: The Lack of Equal Pay for People with Disabilities*' American Institutes for Research (December 2014).

25.     Throughout 2017, the Plaintiff was searching for meaningful work to care for his family and his health. In September of that year, he came upon an ad that Cognizant placed on the website Indeed.com.

26.     The job description stated it was seeking applicants to, '(i)nvestigate and resolve issues… in social media.' The language added that successful

candidates would '(m)ake well balanced decisions and (sic) personally driven to be an effective advocate for our community,' as well as '(d)isplay a strong bias to doing what's right for our community in supporting leading social media objectives.'

27.     After reading Cognizant's job description, the Plaintiff reasoned that it offered an opportunity to grow at a technology company. He had a particular interest in community support and caring for others. This would come in what he thought would be a less-physically-taxing position, offering more ($15.00 per hour) in pay than his job at that time. Most importantly, it seemed to offer stability for his family. The Plaintiff applied for the Cognizant position.

28.     The Defendant, through its recruiter, Jisha Menon (Ms. Menon), contacted the Plaintiff for an interview that same week.

29.     Ms. Menon stated that Cognizant was a 'Fortune 500 Company' with a 'variety of opportunities for growth.' She demurred when asked for specific details about the position, only that it was working on behalf of another major technology company. At the end of the 5-minute conversation, she invited the Plaintiff to the Cognizant facility.

30.     On September 21 of 2017, the Plaintiff came to Cognizant's office (7725 Woodland Center Blvd) in Tampa, Florida for the planned meeting.

31.     There the Plaintiff met with Patrice Williams (Mr. Williams), a 'supervisor' for the Defendant.

32.     During their 30-minute discussion, Mr. Williams shared personal anecdotes of his hobbies, asked the Plaintiff about his own hobbies as well as work experience, and then spent some time on the position.

33.     The Defendant, through Mr. Williams, said that if Plaintiff earned the job, he would work as a 'Process Manager' for Facebook content. It was a position Mr. Williams said, that 'had you moderating hate speech.' He went on to explain that it was 'easy to move around the company' and that Cognizant 'has a place for you depending on the growth you want as long as you work hard or show potential.'  He also said that Cognizant had 'stability,' and that the work did not 'require much' in terms of physicality.

34.     Mr. Williams went on to say that the position was important because 'it made users safe' and that 'moderation safety was the most important aspect of Cognizant and Facebook's work.'

35.     At no point during this 'interview,' in the Defendant's job description, or in conversations with Ms. Menon did anyone at Cognizant reference any of the following: A) the degree to which content other than 'hate speech' would require human moderation; B) the use of machine learning in the context of artificial intelligence (AI); OR C) the use of data labeling to train AI models.

36.     The interview ended, and the Plaintiff believed this to be an opportunity for his career. Cognizant offered a prospect for growth when the Plaintiff had seen little in his working life. There was perceived stability, an

opportunity to move up and forward, and a chance to work at something less taxing on his disability.

37.    Approximately one week following the meeting with Mr. Williams, the Defendant's representative Erik Lund (Mr. Lund) contacted the Plaintiff to offer him a position as a 'Process Executive.' The Plaintiff put in two weeks' notice (after doing this, an employee could not return) at his previous position, and accepted the new offer.

38.    To the Plaintiff, an 'executive' meant that he would have agency and control over his work's cadence, that he would serve as an active contributor, that some of the benefits cited in the tech industry would afford the Plaintiff a more open-minded work environment.

39.    Mr. Lund required Plaintiff to complete a background check and a drug test, both of which Plaintiff passed, to begin work in November of 2017. At no time did Mr. Lund state that Plaintiff would need – or should complete – a psychological assessment. At no time did Mr. Lund indicate that Plaintiff would be watching content that involved anything other than 'hate speech.' At no point did Mr. Lund indicate that Process Executives would label or categorize violent, deeply disturbing, and horrific content.

**Plaintiff's Training As a 'Process Executive' at Cognizant**

40.    Plaintiff began his work with Defendant on or about November 4, 2017. During his first two weeks, the Defendant assigned him to a group of trainees under the supervision of Carl Knaak (Mr. Knaak).

41.     The first two days of training involved Mr. Knaak describing his work and professional accomplishments. He periodically engaged in 'ice breakers' with the new training group, where members could describe their family lives, professional biographies, and the hobbies they enjoyed.

42.     On day 3, Mr. Knaak began his instruction on Facebook and Cognizant's 'Community Standards.' He listed the various regulations governing content, and then explained the underlying rules associated with each standard. There were policies for nudity, violence, self harm, animal cruelty, sexual conduct, terror, solicitation and more. Mr Knaak explained what specific rules applied to content that involved one or more category.

43.     After presentations, Mr. Knaak would administer written tests. He graded them quickly, and then spent time dedicated to group praise and encouragement, telling team members that they were 'doing well' and 'learning fast.'

44.     The training continued like this for more than 5 business days: teaching modules, written tests, and some time for reinforcement/compliments. At no time had Mr. Knaak shown a visual to Plaintiff or the group. He did, though, begin lessons on 'prioritization' for content deletion. He showed which standards superseded others in terms of a hierarchy. For example nudity was a prioritized reason for content deletion over violent conduct. Quizzes and lessons on this ensued.

45.     It wasn't until Day 7 of the training that Mr. Knaak began with a warning that 'today would be the hardest day of your work at Cognizant, but if we watch it we'll get through it together.'

46.     Mr. Knaak then showed a video to the group. It depicted a young man, perhaps a teenager, kneeling naked next to a drainage canal. His hands were restrained behind his back, and he appeared emotionally pained, sobbing — asking for his mother. Another man entered the video's frame with what appeared to be a machete or sharp weapon. He approached the younger man as the camera's focus zoomed closer. Forcibly, he took hold of the young man's right arm, and used his weapon to hack and sever the limb. Blood, bone, and tendon were visible as the victim cried out in pain, asking repeatedly for his mom. The older man ignored the cries, and turned to manipulate the victim's left arm. He swung his weapon several times, and removed this arm as well. Pained and terrified screams leapt from the room's speakers as the viewer looked on, the older man bringing a can of gasoline into the video's frame. He doused the victim, set him on fire, and kicked his body, still screaming, into the canal.

47.     Mr. Knaak turned off the video. He said 'this was not what every day at Cognizant would be like.' These videos, though, were a part of content moderation. He said that they would 'sometimes come' in a moderator queue, so team members needed to understand community standards to properly 'categorize' the content.

48.     Everyone in the room sat in silence. The Defendant had given no indication that videos, like the one just played, would be a part of a Process Executive's work. Mr. Knaak said that this was not an everyday occurrence. Still, it would be difficult for the Plaintiff, or anyone in that room, to forget the visual.

49.     The Plaintiff remembers an intention to take Mr. Knaak at his word. He had encouraged the team, created a sense of community, indicated that getting through something 'together' was important. Yes, the video was emotionally painful, but the Plaintiff also believed that, 'together,' people at Cognizant were going to support each other. The icebreakers, the references to teamwork — they influenced him.

50.     Mr. Knaak started to ask questions. 'How should this video be categorized?' 'What was the main reason to delete it?'

51.     The training members unanimously argued to remove it. Some cited community standards regulating the use of weapons. Others referenced the graphic scenes of limb removal, the use of gasoline, murder (though Mr. Knaak corrected that 'no one actually saw him die'), and terror. The Plaintiff had, however, sat through and memorized much of the prioritization rules associated with Facebook standards. He knew that nudity was the number one priority for content deletion.

52.     Mr. Knaak validated the positions of the group as 'totally real,' but stated the ultimate reason to delete the video should be for 'nudity.' This was because Cognizant prioritized it in removal standards. Any content showing

exposed full frontal genitalia was the main reason to delete a video. He did not explain this further. No one at Cognizant ever did.

53.     The Plaintiff understood the content of Mr. Knaak's presentations, even if the policy and intent behind the standards seemed misguided. He was capable, he rationalized, of working through difficult moments. Also, there was an opportunity to move laterally at Cognizant. He might not have to watch videos forever. As the days passed, Mr. Knaak commented on the Plaintiff's skill, stating that Plaintiff understood the priority rules and 'made sound decisions.'

54.     The final three training days all involved watching or reading content that implicated one or more 'community standards.' Mr. Knaak explained the labeling process, and showed the team how to apply community standards to make content determinations: delete it, mark it as 'sensitive,' or mark it as 'ignore.'

55.     As Mr. Knaak completed his two-week training with the team, he told them they were ready to 'join the production floor.' While there, he asked them to use their new 'skills' and 'education,' as Cognizant expected them to maintain a '98% percent accuracy' rate. Mr. Knaak did not explain how Cognizant determined accuracy.

**Plaintiff's 'Process Executive' Position**

56.     Plaintiff joined the production floor as a Process Executive, tasked to apply 'community standards.' His immediate manager, John Lombardo (Mr. Lombardo), began his  introduction with a chart evidencing the manner with

which Cognizant tracked meal breaks (30 minutes) and a total of 9 minutes dedicated to 'wellness' time. The rest of the Plaintiff's work, according to the Defendant, was to moderate at least 300 content posts per day with 98% accuracy. In a team meeting later that day, Mr. Lombardo stated that Cognizant was 'there for you,' and that the company was 'like a family' where 'mental health was important so we have counseling available whenever you need it.'

57.    For Process Executives to achieve 'accuracy' in their work, they needed to correctly determine if content ran contrary to standards. Anything that did not fall under articulated rules had to remain on the platform. According to the Defendant's metrics, 'accurate' judgments were those where the Executive's choices mirrored those of a Quality Assurance moderator who viewed the same content.

58.    The Plaintiff began the work of a 'Process Executive' and categorized content. At times, it was innocuous. But in many others he saw unconscionable videos and photos. They included beheadings, torture of animals and children, suicides, murders, and other atrocities.

59.    The Plaintiff noted that some of the same content often posted to his queue repeatedly. This was ostensibly due to user shares/re-posts. Some videos appeared over 50 times, and it seemed like there was no mechanism to delete them permanently. Upon information and belief, the Defendant had the technological capability to do just this, but it had a calculated reason to show 'Process Executives' the content, a reason it withheld from its employees.

60.     Gradually, the Plaintiff's arrival home after work was painful. He would cry at random times — avoid contact with loved ones and friends. Relationships seemed to feel more difficult, like navigating them took more effort than times past. Increasingly, fear and paranoia crept into his life. He found himself deeply concerned that strangers would hurt his kids, that other people were by default, dangerous. Sleep started to become elusive, and there would be days that slipped by completely, like he just could not recall what had happened. The Plaintiff did not necessarily attribute this solely to the content at the time, rather the general stress of work and his life. He thought he was 'strong,' just also nervous about his family's financial precarity.

61.     At this point, the Plaintiff's family could barely afford food, clothing, and a roof over their heads. $15.00 per hour never seemed like enough, and each day felt like a struggle for basic necessities. They were completely reliant on his work and income with Cognizant. If he lost it, they would be homeless and deeper in poverty.

62.     After only a short time at Cognizant, the Plaintiff witnessed his first 'red-bag' day at the office. These were spectacle, summary firings where Defendant HR supervisors handed selected employees a red plastic bag at their work stations. Terminated employees then had 15 minutes to gather their belongings, place them in the red bag, and vacate the premises with every other employee present and looking on. The Plaintiff's first supervisor was one of these 'red bag' firings.

63.     The Plaintiff's next supervisor, Chris Molina (Mr. Molina), contacted the Plaintiff and team members on the first day of his new managerial role.

64.     In emails to his employees, Mr. Molina apprised them at least twice daily as to the quantity (amount of content moderated) of each individual team member's work. Everyone was privy to everyone else's data, and Mr. Molina encouraged personal comparisons. One not only saw the quantity of a co-worker's output, they could also determine when their decisions were 'inaccurate' or in conflict with another co-worker's judgment. Lastly, Mr. Molina also referenced the amount of 'bathroom time' that employees used in a given week.

65.     Associated with these disclosures, the Plaintiff began to note a deteriorating civility and antagonism between teammates at work. There was pressure to achieve 'accuracy,' but that word seemed to be a misnomer. The work was not really so much about a judgment being 'correct,' but more about it being in 'agreement.' If team members contradicted one another, it could decrease their overall 'accuracy.' In turn, this would increase a chance for red bag days to affect a given co-worker. Lower scores meant jobs were in jeopardy. For most of these employees, they needed this work; their families were in economic precarity, too.

66.     The Plaintiff witnessed several heated arguments as well as physical violence between fellow employees at work. He understood that many employees carried weapons with them. He also noted that stress seemed to be a marked part of the daily job, and that many people were acting out in ways that Cognizant

seemed to superficially condemn – but via its policies and content – actually promote.

67.     Defendant's facilities also deteriorated. Only four toilets were available for hundreds of workers. They weren't cleaned regularly, and many times the Plaintiff would arrive at work to find them in disrepair, clogged, or occupied for prolonged periods. Some days he would find feces on the walls, dried blood on the floors, or drug paraphernalia in stalls.

68.     The work stations were also unsanitary, often caked with food or refuse from prior shifts. Pubic hair or nail clippings would be wedged between computer keys. Screens and desks were often smeared and dirty from days left unaddressed. The Plaintiff often brought his own cleaning products so he could address his work area.

69.     The Plaintiff knew that working conditions were difficult, but he also coped each day as a disabled person in an often hostile world. He was used to hardship, and he always adapted. Still too, he believed that if he worked harder, if he could prove himself, he could earn an opportunity for a lateral move to a business office or perhaps an IT technician job. His skill had already been noticed, and his accuracy level was very high. Supervisors identified that he had the knowledge base and judgment to work in quality assurance. That meant Defendant showed him even more content, and that 'accuracy' scores of others depended on him.

70.     And the Plaintiff had to make more and more 'judgment calls' about grotesque and disturbing online content. One image that particularly sticks with him was of a man who died of an apparent self-inflicted gunshot wound. In the photo, his brain and skull fragments had scattered around a narrow room. A spray of blood ran down a wall where the gun had fired. Underneath the image, text appeared that read 'Spaghetti-oh's.' Initial determinations were that this image was 'speech mocking death,' a label that meant the content was an 'ignore.' The Plaintiff, however, noticed that the body present in the photo still had a gun in hand pointed inward. He made a final call that it was a 'delete' because it depicted suicide. In Quality Assurance, each piece of content required close inspection.

71.     Another video that Plaintiff recalls from his queue was of a middle-aged man in a small bedroom, an exposed wooden beam ran roughly 2 to 3 feet above his head. In his hands, he held tightly to the ends of what appeared to be two belts. They looked to serve as cables looped over the beam, a form of makeshift pulley. The camera panned outward, and two children appeared in the foreground, the other sides of the belts wrapped tightly around their necks. They were about the same age as the Plaintiff's kids. The man lifted them, and the children struggled intensely. Their limbs swung wildly, their faces a mix of pain and shock.  The video zoomed outward to fully capture the scene, and the viewer looked on helplessly as the man used the belts to strangle and murder the children. It ran just over 2 minutes. The Plaintiff had to watch this over 50 times,

each instance for at least 15 seconds. The Defendant's content standards required each team member to watch a video or image at least 15 seconds, no matter if they had seen it before.

72.     The video of the young man crying for his mother as another man severs his arms also still appeared in the Plaintiff's queue. He heard the young man's screams when he went home from work. He still hears them today, and wonders about the young man's mother, what she knows about her son's death.

73.     In quality assurance, the Plaintiff had to issue written opinions on his decisions. His work often interpreted standards involving terrorism, bestiality, animal cruelty, cannibalism, and child abuse. Moment by moment, he had to recount and describe the scenes in these videos as he articulated his judgments. In effect, the Plaintiff had to relive the scenes from this content again and again.

74.     Over time, the Plaintiff began to recognize that Cognizant's content, and conduct, affected him, but he was unaware of the harm's permanence and degree. He believed that once he changed to a position where he was no longer exposed to the content, work and his life would improve. Stress and economic instability still affected his psychology. For him, professional help required capital, and his current situation provided him little to none. The Defendant had a purported counselor sometimes at the office, but supervisors actively discouraged employees from consulting with them. Allotted time for wellness was 9 minutes per day.

75.     The Plaintiff's relationship with his wife had strained, and escapism was often the only break from pain, even if it never fully went away. It was emotional, yes, but also physical. For reasons he could not understand, he often thought deeply about blood, bones, and pain in the videos he saw. He thought more deeply about his own disabilities, what they might look like if his body were to be opened and inspected. He felt physical pain as he entertained these thoughts. His posture changed; his body felt almost hunched, like he no longer had full physical control of himself.

76.     Almost 8 months into his work, the Plaintiff attempted to visit the mental health counselor at Cognizant. He hoped to begin a dialogue on his symptoms, to understand a possible diagnosis, to perhaps find tools to manage his physical and emotional pain.  During the visit, the counselor stated that they 'did not know how to help' the Plaintiff. They provided him no diagnosis or strategies to move forward. Instead they apologized that he was 'feeling the way he did.'

77.     Immediately after the Plaintiff's first visit to the counselor, Mr. Molina began accosting him, asking why he was being 'weak.' He made statements like, '(m)eeting with a counselor would mean you would be gone too long to do the work.' He often mentioned in conversations that the Plaintiff was 'replaceable.' For his part, the Plaintiff understood  these conversations as thinly veiled threats to his employment, that Mr. Molina would orchestrate a red bag day for the Plaintiff if he continued to seek help.

78.     Around this time, the Plaintiff also began to note that disability or difference was a source of humor for supervisors at the office. The lead supervisor, Ryan Moore, often made derogatory comments. He referred to one person in a company-wide meeting as 'alligator arms.' A woman with a colostomy bag was ridiculed and demeaned after she had an accident at work. Another woman who needed a walker for mobility was referred to as 'sadder than people getting run over by cars in these Facebook videos.'

79.     Many disabled people were swept up in 'red-bag' days. The Plaintiff watched as this went on, he wondered what would happen to him.

80.     Other workers at Cognizant suffered negative health outcomes. During an evening shift, an employee had a heart attack, and passed away while being subjected to videos and content. The office did not have a defibrillator. When the Plaintiff returned to work the next day, the Defendant attempted to misdirect inquiries, claiming that his coworker had survived.

81.     When the Plaintiff looks back at this time, he describes it as one where he was foundering in a pot of water. Without him knowing it, Cognizant had placed the pot on an oven burner with the setting on 'High.' By the time the water started to boil, it was too late. His psychology was grounded in trauma and scarcity. Fear and anxiety ruled his decisions. Pain, both physical and emotional, was a part of his everyday life. There was an awareness that he was struggling, but he did not have a full grasp of where it began and how to address it. He had no background or education in Traumatic Stress, and Cognizant's representation

that it provided counseling for employees was, in practice, untrue and meaningless.  As a disabled person, the Plaintiff knew his employment prospects were limited (mostly by the judgment of others), so his main focus always had to stay on his family. He felt like he just had to work, and that life would be better once he worked hard enough to earn a different position.

82.    The Plaintiff did not know that Defendant had, upon information and belief and at all times material, been aware of psychological studies indicating that exposure to explicit, violent, and hateful content was extremely dangerous to the psychological health of human beings. Facebook knew this (see Paragraph 13), and part of the contract with Cognizant acknowledged it. The Plaintiff was also unaware that Defendant, upon information and belief, was using his work, and the work of others, to train AI via content labeling.

83.    Artificial Intelligence, specifically Machine Learning algorithms (both Supervised and Unsupervised), can perform tasks such as content moderation quickly, using specified or reinforced rules to address decisions without the need for human input. It is, in Cognizant's parlance, scalable.

84.    For Machine Learning to accurately address content, it needs large sets of labeled data from human decision-makers who generate verified, agreed-upon judgments. Consensus from moderators is essential to counteract bias, which assists an algorithm to address content long term. Machine Learning needs what software developers call 'ground truth.'

85.     With millions of daily posts, the algorithms need large quantities (likely in the millions) of training-data sets to moderate hate speech, violence, child abuse, terrorism, and more. Some objectionable content is easier for an algorithm to identify. For example, AI can scan pixels and images to determine nudity with a high degree of precision, while it can struggle to identify the specifics of child abuse or the motivations of a terrorist. It needs a prioritization tree – and labelers with specific cultural knowledge – to make millions of determinations before it can make meaningful 'progress.'

86.     Upon information and belief, the Defendant never disclosed that the reason its Process Executives kept seeing objectionable posts – each for at least 15 seconds – was to reinforce 'ground truth,' to train data for an algorithm essentially designed to replace human work.

87.     The Plaintiff had no knowledge that Cognizant (upon information and belief) was using Machine Learning as the touchstone for its processes, that Defendant connected its 'accuracy' metrics to eliminate 'bias' in data sets, that the video of a tortured young man crying for his mom had to be deleted for 'nudity' and not 'murder' because of an AI-related, data priority. The Defendant continued to show the Plaintiff videos of the same content for a reason — and it was not for a lack of technological expertise. Upon information and belief, Cognizant needed its employees to generate an expansive data catalog. The Defendant wanted to train AI – and create valuable intellectual property from it –

24

at immense expense to Process Executives like the Plaintiff. If the Plaintiff had known this, he would not have accepted this $15.00 per hour job.

88.    Despite the statements made to induce the Plaintiff's job acceptance, he is not aware of anyone at the office who received a lateral opportunity at Cognizant.

89.    After several attempts to understand his feelings and the exact nature of his trauma, including more attempts to reach out to a counselor at the Cognizant office, the Plaintiff received a red bag in early 2019. Defendant's supervisors, including Mr. Molina and Alexander Kosharek, threatened the Plaintiff, stating that he 'might never work in Tampa Bay again.'

**Plaintiff's Diagnoses Post Employment with Cognizant**

90.    After his termination, the Plaintiff was essentially homeless with a family of 4.

91.    It was not until May of 2021 that Habitat for Humanity helped the Plaintiff and his family find shelter of their own. The organization also supported the Plaintiff to find work. He moved forward, but still, he noticed his life and overall health were in a compromised place.  The Plaintiff had left the job at Cognizant, but the job at Cognizant did not leave him. He decided to work with a licensed mental health professional.

92.    In June of 2021 the Plaintiff began regular meetings with a licensed clinician. In December of that year, the provider diagnosed the Plaintiff with: Post-Traumatic Stress Disorder, Acute Stress Disorder, Trauma and Stress

Related Disorder, Generalized Anxiety Disorder, Depression, Migraine Disorder,

Sleep Paralysis, Insomnia, Night Terrors, Arthritis, Chronic Pain Syndrome,

ETOH Abuse, Chronic Pain Disorder, Agoraphobia (Severe Panic Disorder),

Paranoid Disorder, and Avoidant Food Intake Disorder (Induced from

Cannibalism Videos). The Plaintiff was unaware that he had suffered permanent

trauma from Cognizant until his work with the clinician fully alerted him.

93.     Prior to his work at Cognizant, the Plaintiff described himself as a

highly motivated and ambitious husband and father. The position as well as the

content he saw at Cognizant took that from him. Today, the Plaintiff is a different

person, and will never be the same after the emotional distress he endured as a

result of the Defendant's conduct.

## PLAINTIFF'S CLAIMS

### First Claim
### Fraudulent Misrepresentation (Florida Law)

94.     Plaintiff incorporates and re-alleges all allegations in Paragraphs

1-93.

95.     The Defendant, by and through its representatives, Ms. Mennon, Mr.

Williams, Mr. Lund, Mr. Knaak, and Mr. Lombardo, knowingly made false and

misleading statements to Plaintiff concerning the material facts of his

employment. Some examples include:

- Ms. Mennon and Mr. Williams made statements to the effect that
  Cognizant offered lateral employment opportunities at the company

when none in-fact existed. Mr. Williams's statements that it was 'easy to move around the company' and that Cognizant 'has a place for you depending on the growth you want as long as you work hard or show potential' were false. So too were Ms. Menon's statement that Cognizant 'offers a variety of opportunities for growth.' Defendant had no intent to laterally transfer their Process Executives. Upon information and belief, no Process Executives at Cognizant earned opportunities at anything other than content moderation/data labeling. When the job inevitably affected employees to the point of diminishing work performance, Cognizant gave them a red bag, and terminated their employment.

- Mr. Lombardo made statements that Cognizant was 'like a family' and Mr. Williams intimated that Cognizant offered stability, citing Fortune 500 status/corporate resources to evidence employment safety and certainty. These statements were knowingly false and misleading. Cognizant administered an unconscionable work environment. Its management actively berated, intimidated, and mocked their workforce, pitting them against one other, manipulating their psychologies. The Defendant's facilities were dangerous, unhygienic, and likely fell below code of several workplace and building regulations. Managers did not address this meaningfully, and instead further traumatized employees,

orchestrating spectacle employee firings to promote fear and squash dissent, to ensure that employees continued updating data models in service of Cognizant's business interests. These conditions only worsened Plaintiff's trauma.

- Mr. Knaak formulated a statement on Day 7 of Plaintiff's training that 'today would be the hardest day of your work at Cognizant,' which was knowingly false, and intended to mislead Plaintiff and maintain his employment status.

- Mr. Knaak made further statements on Day 7 of Plaintiff's training, that the video of a young man's graphic murder was not an 'everyday occurrence' and 'not what every day at Cognizant would be like.' These were also false. Such content was frequent, and Cognizant required Plaintiff to re-watch these videos repeatedly for at least 15 seconds at a time.

- Cognizant falsely claimed that, 'moderation safety was the most important aspect of Cognizant and Facebook's work.' Safety, both for moderators and Facebook users, was not important to the Defendant. Its work environment and its corporate culture evidenced the contrary conclusion. To Defendant, the most important aspects of its work were the lucrative nature of a Facebook business relationship and 'scalable' opportunities for content moderation.

- Also troubling was Mr. Lombardo's promise that Cognizant was 'there for you' and that 'mental health was important so we have counseling available ***whenever you need it***.' *(Emphasis added)* These statements could not have been further from the truth. Cognizant's requirement that Plaintiff moderate over 300 images and videos daily also made access to mental health care a constructive impossibility. When Plaintiff, or any employee, sought counseling, they were chastised and threatened with termination for exceeding their 9 minutes of allotted 'personal' time. Moreover, Cognizant's counselor lacked the skills, experience, or incentive to render meaningful assistance. Upon information and belief, the counselor lacked appropriate credentials, and was incentivized to discourage employees from utilizing the 'service.' To the Defendant, a team member's visit to a counselor would detract from employee 'productivity.'

- Cognizant explicitly offered a false premise that Plaintiff, and all employees, were working to 'investigate and resolve issues … in social media,' to make 'well balanced decisions and (sic) personally driven' to 'be effective advocate(s)' for 'our community.' Cognizant was not in fact seeking candidates to display a 'strong bias to doing what's right' for any 'community.' It was seeking vulnerable people with culturally-specific knowledge to interpret rules from a decision

tree. This was done, upon information and belief, so that Cognizant could eventually replace its Process Executives with AI, obviating any need to address the severe human cost that the Plaintiff, and employees like him, paid for this work.

- The Defendant manipulated a job description with the title 'Process Executive,' when, upon information and belief, it knew the work's purpose centered on AI data labeling for extreme content. There was no actual supervisory role in this position. The Defendant in effect misled the Plaintiff to engage his employment using piecemeal emotional manipulation. It avoided the description of daily tasks, and instead primed the Plaintiff with repeated references to 'community,' 'safety,' and 'family.'

96.    The Defendant and its representatives knew that each of these representations were false and misleading.

97.    The Defendant made all its misleading statements to induce the Plaintiff's employment and to keep him in its employ throughout his tenure.

98.    The Plaintiff reasonably relied on Defendant's false statements.

99.    As a result of Defendant's fraud, Plaintiff has been damaged, including actual, general, and special damages in amounts to be proven at trial.

100.   Plaintiff's special damages include lost wages, medical expenses, therapy expenses, medication expenses, and other expenses relating to his conditions and struggles associated with his time at Cognizant.

## Second Claim
### Negligent Misrepresentation (Florida Law)

101.   The Plaintiff incorporates and re-alleges all allegations in Paragraphs 1-100.

102.   Under Florida law, the elements for Negligent Misrepresentation include: 1) an unknowingly false or misleading statement, 2) the Defendant should have known the statement was false or misleading, 3) the Defendant intended to induce the Plaintiff to act on it, 4) the Plaintiff reasonably relied on the statement, 5) resulting in damage.

103.   Even if Defendant and its representatives made statements without knowledge of their falsehood, they reasonably should have known the statements were false and misleading.

104.   Each of these statements were crafted to either engage or maintain the Plaintiff's employment.

105.   The Plaintiff reasonably relied on these statements, and made decisions based on their content.

106.   The Plaintiff suffered damages as outlined above and is entitled to recover such damages in amounts to be proven at trial.

## Third Claim
### Intentional Infliction of Emotional Distress (Florida Law)

107.   The Plaintiff incorporates and re-alleges all allegations in Paragraphs 1-106.

108.   Under Florida Law, the elements for Intentional Infliction of Emotional Distress include: 1) deliberate or reckless infliction of emotional suffering, 2) conduct deemed to be outrageous or intolerable in a civilized community, 3) the conduct caused the emotional distress, and 4) the distress was severe.

109.   In this case, Cognizant acted deliberately and recklessly to inflict emotional distress on the Plaintiff. Cognizant knew – or should have known – that permanent and debilitating harm would result from its conduct. It subjected vulnerable human beings to repeated images of unimaginable horror. The Defendant did this with the knowledge that Traumatic Stress would result. Still, Cognizant misled the Plaintiff with a fraudulent hiring process, exploited a labor market seeking technology jobs, and subjected the Plaintiff to content that permanently damaged him. It did this while effectively blocking Plaintiff's access to care. Compounding that, the Defendant fostered an environment designed to generate antagonism and hurt, aligning incentives that sowed animosity. Supervisors actively intimidated employees, tracked their every minute, left them in unsanitary conditions, and questioned basic dignities like bathroom usage. The Defendant used public showings to sack workers, choosing the color red as a tool to generate fear, to intimidate vulnerable people. These human beings, including the Plaintiff, experienced daily trauma from content that depicted murder, rape, child abuse, and torture. The Defendant required them to process this horrific content repeatedly, in effect sentencing them to relive it over and

over. The Defendant, through its supervisors, also actively intimidated disabled people like the Plaintiff, calling an employee 'alligator arms' in an attempt to demean him, ridiculing a human being with a colostomy, and attempting to mock a person with an assistive mobility device.

110.    All of this is outrageous and intolerable in a civilized community.

111.    The conduct caused Plaintiff severe emotional distress. Every day at work, he felt intimidated, demeaned, and distressed. The videos, the work conditions, the comments — all of it affected him profoundly. He considers himself an empath, a person that feels deeply. Had the Defendant conducted psychological testing, it might have discovered the Plaintiff's sensitivity. Instead, it conducted no meaningful employee screening; it provided no meaningful disclosures during an imitation interview that lasted 30 minutes. The Plaintiff was in effect the recipient of all the hurt – emotional and physical – that came from Cognizant's time in Tampa. It has since closed all content operations there, and moved to other States and other countries. It currently remains a 'Fortune 500' company, seeking opportunities for 'scalability' when it comes to AI and its business use.

112.    The Plaintiff's distress is severe. He suffers from Post-Traumatic Stress Disorder, Acute Stress Disorder, Trauma and Stress Related Disorder, Generalized Anxiety Disorder, Depression, Migraine Disorder, Sleep Paralysis, Insomnia, Night Terrors, Arthritis, Chronic Pain Syndrome, ETOH Abuse, Chronic Pain Disorder, Agoraphobia (Severe Panic Disorder), Paranoid Disorder,

and Avoidant Food Intake Disorder (Induced from Cannibalism Videos). But that just doesn't fully capture it. The Plaintiff can never be the same again after seeing thousands of murders, rapes, suicides, deaths, instances of child abuse and more. His life – and by extension the lives of his children– will be forever changed by this.

113.    As a result of all allegations recounted in this Complaint, the Plaintiff will seek compensatory and punitive damages at trial.

## **DEMAND FOR JURY TRIAL**

114.    Plaintiff demands a trial by jury in this matter.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests this Court grant Plaintiff the following relief:

1)    Judgment in his favor and against Defendant;

2)    An award of actual, compensatory, general, emotional, and punitive and exemplary damages in amounts to be proven at trial;

3)    An award of special damages, including lost pay, medical expenses, lost future earning capacity, emotional distress, and loss of enjoyment of life;

4)    Taxation of attorneys fees and costs against Defendant; AND

5)    Such other relief as this Court deems just and equitable.

Respectfully Submitted,

/s/ Christopher Lovelady
Christopher Lovelady, Esq
FBN: 0852821
8386 66th Way
Pinellas Park, FL 33781
727-430-4137
cmlovelady@aol.com

November 13, 2023
Pinellas Park, Florida