# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

NICHOLAS LOVELADY

    Plaintiff,

      v.                            Civ. No. 8:21-CV-2054-MSS-AEP

                                       JURY TRIAL DEMANDED

COGNIZANT TECHNOLOGY
SOLUTIONS U.S. CORPORATION

    Defendant.

_____

## PLAINTIFF'S THIRD AMENDED COMPLAINT

Pursuant to the Court's [Insert Date] Order (Dkt. ___), Plaintiff Nicholas Lovelady, by and through his undersigned attorney, alleges the following:

## **INTRODUCTION**

1.     This  suit seeks to redress unlawful and tortious conduct in the technology industry. The Defendant, Cognizant Technology Solutions (Cognizant), made a series of misrepresentations to engage and maintain the Plaintiff's employment. Cognizant did this at the expense of Plaintiff's health and dignity, subjecting him to severe damages.

2.     Through its representatives, the Defendant engaged in fraudulent misrepresentation to actively conceal the nature of its business and work. Cognizant issued false and misleading job descriptions, then orchestrated a simulated interview process to engage the Plaintiff's employment. Thereafter, it

manipulated the Plaintiff, and made further fraudulent promises regarding the availability of mental health support. The Plaintiff reasonably relied on the misrepresentations, resulting in extreme, life-altering trauma.

3.    Cognizant operated a dangerous and manipulative environment designed to stifle dissent, intimidate workers, and block access to meaningful mental health resources. The Defendant did this in an unsanitary workspace, where it subjected human beings, including the Plaintiff, to horrific and unspeakable content. Using calculated leverage, Cognizant caused the Plaintiff severe damage.

4.    Initially, the Plaintiff was one of several parties to file suit in Aaliyah Aguilo, et al. v. Cognizant Technology Solutions U.S. Corporation (Case No: 8:21-cv-2054-MSS-AEP). He has continued as an individual Plaintiff in this matter since November of 2023.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332. The Plaintiff is a Florida resident and citizen, and the Defendant Cognizant is a Delaware Corporation and citizen of that State.

6.    Plaintiff seeks recovery of damages in excess of $75,000.00.

7.    Venue and jurisdiction are proper under 28 U.S.C. § 1391(b)(2) as there exists complete diversity of the parties, the amount in controversy exceeds the jurisdictional limit, and the events giving rise to this action occurred in Hillsborough County, Florida.

## PARTIES

### Plaintiff

8.      Plaintiff is a former Cognizant employee. Born with two genetic disabilities, Multiple Osteochondromas (MO) and cranio-facial Fibrous Dysplasia (FD), he has had over thirty (30) surgeries to address complications from the conditions. The disabilities, and the surgeries themselves, affect the Plaintiff's appearance. He has skeletal differences, asymmetry, and dysplasia throughout his body. As a child, during one particular cranial procedure, surgeons scarred his optic nerve, resulting in full and complete blindness in his left eye. This affects his ability to work in many jobs and navigate daily life.

### Defendant

9.      The Defendant is a Delaware corporation currently headquartered in Texas. It operated a facility in Hillsborough County, Florida where the events giving rise to Plaintiff's claims occurred. Cognizant is in the primary business of third-party contracting and outsourcing. In this specific action, the Defendant maintained a contractual relationship with social media company Facebook, Inc. (Now 'Meta;' for purposes of this pleading, 'Facebook' and 'Meta' will be used interchangeably). As part of the agreement, the Defendant accepted responsibility to monitor, moderate and curate content posted to the Facebook social media site.

## STATEMENT OF FACTS

### Defendant's White Paper

10.     As early as January of 2012, the Defendant promoted cost-savings

and leveraging in the content moderation space. This was done through

advertising materials, including the use of a 'White Paper,' a document designed

to highlight and promote business offerings.

11.     In this material, the Defendant attempted to publicize a potential

price point for personalized content moderation, maintaining that video, audio,

image, and text could be curated at certain touchstones (eg. 1,000 video clips

could be moderated via human intervention for $277.00, Audio clips at $230.00,

Images at $.70, and Text at $167.00). Abhijeet Khadilikar, et al., *How to De-Risk*

*the Creation of and Moderation of User-Generated Content,* Cognizant 20-20

Insights, Jan. 2012, Pages 1-7, at 4.

12.     The Defendant was aware that content could run the gamut

from the inane to potentially graphic and life-altering. The White Paper, however,

did not discuss the hurdles and human cost of this work. Instead, it argued that

human moderation could be "inefficient." Cognizant went on to conclude that the

largest challenge wasn't the content itself, but rather, "scalability." *Id.* at 5.

### Defendant Contracts with Facebook to Provide Content Moderation

13.     Upon information and belief, in approximately January of 2017, the

Defendant contracted with Facebook, Inc. to outsource moderation for

user-generated content. Estimated terms for the contract included a 2-year
duration with $200,000,000.00 in consideration for the service.

14.     Faced with a rapidly growing user base, large swathes of content, and
a psychological cost that executives themselves had trouble processing, Facebook
employed contracting companies to moderate user postings. *See* Sudhir
Venkatesh, *The Garbage Can Model of Decision Making* (2021),
https://freakonomics.com/podcast/the-garbage-can-model-of-decision-making/
(Last Accessed 10/22/23)(Discussing the extreme psychological toll Facebook
executives paid after being subjected to these videos. High ranking executives
cried, cited intense emotional suffering, and still recounted effects even years
after they viewed the content).

15.   The process provided an escalation procedure on the Facebook
platform. Users reported objectionable material, and human moderators would
determine the suitability of content based on internal rules or what Facebook
called "community standards."

16.   The Facebook and Cognizant 'standards' were not static, and the
parties altered them often based on 'novel scenarios' or changing needs.

17.     For its part, the Defendant agreed to maintain a contracting
workforce as well as office space for the moderators.

18.     Cognizant also controlled the talent selection process. Specifically,
the Defendant agreed to psychologically screen applicants for potential mental
health concerns prior to their full-time employment. This was also to come in

tandem with disclosures, notifying potential employees that much of the Facebook content could include objectionable, damaging, and triggering visuals.

19.    Facebook also contracted with Defendant to offer employees consistent education and psychological services. The education component was to support employees as they made complicated decisions on content 'standards' in specific video and fact-sets. Cognizant and Facebook anticipated that employees would also develop trauma-induced side effects. Cognizant therefore agreed to provide open access to psychological support.

**<u>Defendant Hires Plaintiff As a 'Process Executive'</u>**

20.    In February of 2017, the Defendant began its hiring process for "process executive" positions in Phoenix, AZ and Tampa, FL. These labor markets are known to have traditionally lower median incomes and higher unemployment rates. *Employment and Wages, Annual Averages 2017*, U.S. Bureau of Labor Statistics, https://www.bls.gov/cew/publications/employment-and-wages-annual-averages/2017/home.htm (Last Visited 11/1/23).

21.    During this time, the Plaintiff was a working and disabled husband and father. He was the sole economic provider for a household of 4, his wife unable to work, his two children aged 5 and 1-year-old at the time. Doctors had recently diagnosed the Plaintiff's youngest child with autism, as well as the Plaintiff's same genetic disability, MO.

22.    The Plaintiff's work at the time was just above minimum wage, his family living at the poverty line. It was also physically difficult, requiring quick

use of his arms and legs as he maintained the rest of his body in fixed, painful positions. It further required him to consistently rotate his neck and head due to the inability to see from his left eye.

23.    With the Plaintiff's disability, the long term tenability of his work was uncertain. People with MO experience prolonged pain associated with nerve compression, limb bowing, and often large masses throughout their body. Complications from this pain, as well as the strain from pivoting his vision, made work very difficult for the Plaintiff.

24.    Despite hurdles, the Plaintiff had earned a college degree, yet throughout his professional career, found himself consistently under-employed.

25.    This is often the case for disabled people, especially those with visible differences. The average person with a disability is almost 2-times as likely to be unemployed as an able-bodied person. Even if disabled people can earn employment, they often earn less – 40 percent less –  in earnings compared to their able-bodied counterparts. *See* Yin, Michelle et al., *An Uneven Playing Field: The Lack of Equal Pay for People with Disabilities*, American Institutes for Research (December 2014).

26.    Throughout 2017, the Plaintiff was searching for meaningful work to care for his family and his health. In September of that year, he came upon an ad that Cognizant placed on the website Indeed.com.

27.    The job description stated it was seeking applicants to, "(i)nvestigate and resolve issues... in social media." The language added that successful

candidates would "(m)ake well balanced decisions and (sic) personally driven to be an effective advocate for our community," as well as "(d)isplay a strong bias to doing what's right for our community in supporting leading social media objectives."

28.    After reading Cognizant's job description, the Plaintiff reasoned that it offered an opportunity to grow at a technology company. He had a particular interest in community support and caring for others. This would come in what he thought would be a less-physically-taxing position, offering more ($15.00 per hour) in pay than his job at that time. Most importantly, it seemed to offer stability for his family. The Plaintiff applied for the Cognizant position.

29.    The Defendant, through its recruiter, Jisha Menon (Ms. Menon), contacted the Plaintiff for an interview that same week.

30.    Ms. Menon stated that Cognizant was a "Fortune 500 Company" with a "variety of opportunities for growth." She demurred when asked for specific details about the position, only that it was working on behalf of another major technology company. At the end of the 5-minute conversation, she invited the Plaintiff to the Cognizant facility.

31.    On September 21 of 2017, the Plaintiff came to Cognizant's office (7725 Woodland Center Blvd) in Tampa, Florida for the planned meeting.

32.    There the Plaintiff met with Patrice Williams (Mr. Williams), a 'supervisor' for the Defendant.

33.     During their 30-minute discussion, Mr. Williams shared personal anecdotes of his hobbies, asked the Plaintiff about his own hobbies as well as work experience, and then spent some time on the position.

34.     The Defendant, through Mr. Williams, said that if Plaintiff earned the job, he would work as a "Process Manager" for Facebook content. It was a position Mr. Williams said, that "had you moderating hate speech." He stated that Cognizant "has a place for you depending on the growth you want as long as you work hard or show potential."  He also said that Cognizant had "stability," and that the work did not "require much" in terms of physicality.

35.     Mr. Williams went on to say that the position was important because "it made users safe" and that "moderation safety was the most important aspect of Cognizant and Facebook's work."

36.     At no point during this 'interview,' in the Defendant's job description, or in conversations with Ms. Menon did anyone at Cognizant reference any of the following: A) the degree to which content other than 'hate speech' would require human moderation; B) the known effects and human impact of the job; D) the use of machine learning in the context of artificial intelligence (AI); OR E) the use of data labeling to train AI models.

37.     The interview ended, and the Plaintiff believed this to be an opportunity for his career. Cognizant offered a prospect for growth when the Plaintiff had seen little in his working life. There was perceived stability, an

opportunity to move up and forward, and a chance to work at something less
taxing on his disability.

38.    Approximately one week following the meeting with Mr. Williams,
the Defendant's representative Erik Lund (Mr. Lund) contacted the Plaintiff to
offer him a position as a "Process Executive." The Plaintiff put in two weeks'
notice (after doing this, an employee could not return) at his previous position,
and accepted the new offer.

39.    To the Plaintiff, an 'executive' meant that he would have agency and
control over his work's cadence, that he would serve as an active contributor, that
some of the benefits cited in the tech industry would afford the Plaintiff a more
open-minded work environment.

40.    Mr. Lund required Plaintiff to complete a background check and a
drug test, both of which Plaintiff passed, to begin work in November of 2017. At
no time did Mr. Lund state that Plaintiff would need – or should complete – a
psychological assessment. At no time did Mr. Lund indicate that Plaintiff would
be watching content that involved anything other than 'hate speech.' At no point
did Mr. Lund indicate that Process Executives would label or categorize violent,
deeply disturbing, and horrific content.

## Plaintiff's Training As a 'Process Executive' at Cognizant

41.    Plaintiff began his work with Defendant on or about November 4,
2017. During his first two weeks, the Defendant assigned him to a group of
trainees under the supervision of Carl Knaak (Mr. Knaak).

42.    The first two days of training involved Mr. Knaak describing his
work and professional accomplishments. He periodically engaged in 'ice breakers'
with the new training group, where members could describe their family lives,
professional biographies, and the hobbies they enjoyed.

43.    On day 3, Mr. Knaak began his instruction on Facebook and
Cognizant's 'Community Standards.' He listed the various regulations governing
content, and then explained the underlying rules associated with each standard.
There were policies for nudity, violence, self harm, animal cruelty, sexual
conduct, terror, solicitation and more. Mr Knaak explained what specific rules
applied to content that involved one or more category.

44.    After presentations, Mr. Knaak would administer written tests. He
graded them quickly, and then spent time dedicated to group praise and
encouragement, telling team members that they were "doing well" and "learning
fast."

45.    The training continued like this for more than 5 business days:
teaching modules, written tests, and some time for reinforcement/compliments.
At no time had Mr. Knaak shown a visual to Plaintiff or the group. He did,
though, begin lessons on 'prioritization' for content deletion. He showed which
standards superseded others in terms of a hierarchy. For example nudity was a
prioritized reason for content deletion over violent conduct. Quizzes and lessons
on this ensued.

46.    It wasn't until Day 7 of the training that Mr. Knaak began with a warning that "today would be the hardest day of your work at Cognizant, but if we watch it we'll get through it together."

47.    Mr. Knaak then showed a video to the group. It depicted a young man, perhaps a teenager, kneeling naked next to a drainage canal. His hands were restrained behind his back, and he appeared emotionally pained, sobbing — asking for his mother. Another man entered the video's frame with what appeared to be a machete or sharp weapon. He approached the younger man as the camera's focus zoomed closer. Forcibly, he took hold of the young man's right arm, and used his weapon to hack and sever the limb. Blood, bone, and tendon were visible as the victim cried out in pain, asking repeatedly for his mom. The older man ignored the cries, and turned to manipulate the victim's left arm. He swung his weapon several times, and removed this arm as well. Pained and terrified screams leapt from the room's speakers as the viewer looked on, the older man bringing a can of gasoline into the video's frame. He doused the victim, set him on fire, and kicked his body, still screaming, into the canal.

48.    Mr. Knaak turned off the video. He said "this was not what every day at Cognizant would be like." These videos, though, "were a part of content moderation." He said that they would "sometimes come in a moderator queue, so team members needed to understand community standards to properly 'categorize' the content."

49.    Everyone in the room sat in silence. The Defendant had given no
indication that videos, like the one just played, would be a part of a Process
Executive's work. Mr. Knaak said that such horrific content was not an everyday
occurrence. Still, it would be difficult for the Plaintiff, or anyone in that room, to
forget the visual.

50.    The Plaintiff remembers an intention to take Mr. Knaak at his word.
Knaak had encouraged the team, created a sense of community, indicated that
getting through something 'together' was important. Yes, the video was
emotionally painful, but the Plaintiff also believed Cognizant, that 'together' they
would support each other. The icebreakers, the references to teamwork, the
praise — all of it influenced him.

51.    Mr. Knaak started to ask questions. "How should this video be
categorized?" "What was the main reason to delete it?"

52.    The training members unanimously argued to remove it. Some cited
community standards regulating the use of weapons. Others referenced the
graphic scenes of limb removal, the use of gasoline, murder (though Mr. Knaak
corrected that "no one actually saw him die"), and terror. The Plaintiff had,
however, sat through and memorized much of the prioritization rules associated
with Facebook standards. He knew that nudity was the number one priority for
content deletion.

53.    Mr. Knaak validated the positions of the group as "totally real," but
stated the ultimate reason to delete the video should be for 'nudity.' This was

because Cognizant prioritized it in removal standards. Any content showing exposed full frontal genitalia was the main reason to delete a video. He did not explain this further. No one at Cognizant ever did.

54.    The Plaintiff understood the content of Mr. Knaak's presentations, even if the policy and intent behind the standards seemed misguided. He was capable, he rationalized, of working through difficult moments. Also, there was opportunity at Cognizant. He might not have to watch videos forever. As the days passed, Mr. Knaak commented on the Plaintiff's skill, stating that Plaintiff understood the priority rules and "made sound decisions."

55.    The final three training days all involved watching or reading content that implicated one or more 'community standards.' Mr. Knaak explained the labeling process, and showed the team how to apply community standards to make content determinations: delete it, mark it as 'sensitive,' or mark it as 'ignore.'

56.    As Mr. Knaak completed his two-week training with the team, he told them they were ready to "join the production floor." While there, he asked them to use their new 'skills' and 'education,' as Cognizant expected them to maintain a '98% percent accuracy' rate. Mr. Knaak did not explain how Cognizant determined accuracy.

**Plaintiff's 'Process Executive' Position**

57.    Plaintiff joined the production floor as a Process Executive, tasked to apply 'community standards.' His immediate manager, John Lombardo (Mr.

Lombardo), began his introduction with a chart evidencing the manner with
which Cognizant tracked meal breaks (30 minutes) and a total of 9 minutes
dedicated to 'wellness' time. The rest of the Plaintiff's work, according to the
Defendant, was to moderate at least 300 content posts per day with 98%
accuracy.

58.     In a team meeting later that same day, Mr. Lombardo stated that
Cognizant was "there for you," and that the company was a place where "mental
health was important."

59.     During that meeting, Mr. Lombardo also told the Plaintiff that
Cognizant had "counseling available whenever you need it."

60.     For Process Executives to achieve 'accuracy' in their work, they
needed to correctly determine if content ran contrary to standards. Anything that
did not fall under articulated rules had to remain on the platform. According to
the Defendant's metrics, 'accurate' judgments were those where the Executive's
choices mirrored those of a Quality Assurance moderator who viewed the same
content.

61.     The Plaintiff began the work of a 'Process Executive' and categorized
content. At times, it was innocuous. But in many others he saw unconscionable
videos and photos. They included beheadings, torture of animals and children,
suicides, murders, and other atrocities.

62.     Content often posted to the Plaintiff's queue repeatedly. This was
ostensibly due to user shares/re-posts. Some videos appeared over 50 times, and

it seemed like there was no mechanism to delete them permanently. Upon

information and belief, the Defendant had the technological capability to do just

this, but it had a calculated reason to show 'Process Executives' the content, a

reason it withheld from its employees like the Plaintiff.

63.    Gradually, the Plaintiff's arrival home after work became painful. He

would cry at random times — avoid contact with loved ones and friends.

Relationships seemed to feel more difficult, like navigating them took more effort

than times past. Increasingly, fear and paranoia crept into his life. He found

himself deeply concerned that strangers would hurt his kids, that other people

were by default, dangerous. Sleep started to become elusive, and there would be

days that completely slipped by, like he just could not recall what had happened.

The Plaintiff did not necessarily attribute this solely to the content at the time,

rather the general stress of work and his life. He thought he was 'strong,' just also

nervous about his family's financial precarity.

64.    At this point, the Plaintiff's family could barely afford food, clothing,

and a roof over their heads. $15.00 per hour never seemed like enough, and each

day felt like a struggle for basic necessities. They were completely reliant on his

work and income with Cognizant. If he lost it, they would be deeper in poverty

and likely homeless.

65.    After only a short time at Cognizant, the Plaintiff witnessed his first

'red-bag' day at the office. These were spectacle, summary firings where

Defendant HR supervisors publicly handed selected employees a red plastic bag

16

at their work stations. They then had 15 minutes to gather their belongings, place them in the red bag, and vacate the premises with every other employee present and looking on. The Plaintiff's first supervisor was one of these 'red bag' firings.

66.    The Plaintiff's next supervisor, Chris Molina (Mr. Molina), contacted the Plaintiff and team members on the first day of his new managerial role.

67.    In emails to his employees, Mr. Molina apprised them at least twice daily as to the quantity (amount of content moderated) of each individual team member's work. Everyone was privy to everyone else's data, and Mr. Molina encouraged personal comparisons. One not only saw the quantity of a co-worker's output, they could also determine when their decisions were 'inaccurate' or in conflict with another co-worker's judgment. Lastly, Mr. Molina also referenced the amount of "bathroom time" that employees used in a given week.

68.    Associated with these disclosures, the Plaintiff began to note a deteriorating civility and antagonism between teammates. There was pressure to achieve 'accuracy,' but that word seemed to be a misnomer. The work was not really so much about a judgment being 'correct,' but more about it being in 'agreement.' If team members contradicted one another, it could decrease their overall 'accuracy.' In turn, this would increase a chance for red bag days to affect a given co-worker. Lower scores meant jobs were in jeopardy. For most of these employees, they needed this work; their families were in economic precarity, too.

69.    The Plaintiff witnessed several heated arguments as well as physical violence between fellow employees at work. It was openly known by all (including

Defendant) that many employees carried weapons with them. The Plaintiff also noted that many people were acting out in ways that Cognizant seemed to superficially condemn – but via its policies and content – actually promote.

70.     Defendant's facilities also deteriorated. Only four toilets were available for hundreds of workers. They weren't cleaned regularly, and many times the Plaintiff would arrive at work to find them in disrepair, clogged, or occupied for prolonged periods. Some days he would find feces on the walls, dried blood on the floors, or drug paraphernalia in stalls.

71.     The work stations were also unsanitary, often caked with food or refuse from prior shifts. Pubic hair or nail clippings would be wedged between computer keys. Screens and desks were often smeared and dirty from days left unaddressed. The Plaintiff often brought his own cleaning products so he could address his work area.

72.     The Plaintiff knew that working conditions were difficult, but he also coped each day as a disabled person in an often hostile world. He was used to hardship, and he always adapted. Still too, he believed that if he worked harder, if he could prove himself, he could earn an opportunity for a lateral move to a business office or perhaps an IT technician job. The Plaintiff believed that, once he changed positions at Cognizant, he would return to "normal" and his mental suffering would end. His skill had already been noticed, and his accuracy level was very high. Supervisors identified that he had the knowledge and judgment to

work in quality assurance. That ultimately meant Defendant showed him even more content, and that 'accuracy' scores of others depended on him.

73.    And the Plaintiff had to make more and more 'judgment calls' about grotesque and disturbing online content. One image that particularly sticks with him was of a man who died of an apparent self-inflicted gunshot wound. In the photo, his brain and skull fragments had scattered around a narrow room. A spray of blood ran down a wall where the gun had fired. Underneath the image, text appeared that read "Spaghetti-oh's." Initial determinations were that this image was 'speech mocking death,' a label that meant the content was an 'ignore.' The Plaintiff, however, noticed that the body present in the photo still had a gun in hand pointed inward. He made a final call that it was a 'delete' because it depicted suicide. In Quality Assurance, each piece of content required close inspection.

74.    Another video that Plaintiff recalls from his queue was of a middle-aged man in a small bedroom, an exposed wooden beam ran roughly 2 to 3 feet above his head. In his hands, he held tightly to the ends of what appeared to be two belts. They looked to serve as cables looped over the beam, a form of makeshift pulley. The camera panned outward, and two children appeared in the foreground, the other sides of the belts wrapped tightly around their necks. They were about the same age as the Plaintiff's kids. The man lifted them, and the children struggled intensely. Their limbs swung wildly, their faces a mix of pain and shock.  The video zoomed outward to fully capture the scene, and the viewer

looked on helplessly as the man used the belts to strangle and murder the children. It ran just over 2 minutes. Cognizant made the Plaintiff watch this over 50 times, each instance for at least 15 seconds. The Defendant's content standards required each team member to watch a video or image at least 15 seconds, no matter if they had seen it before.

75.     The video of the young man crying for his mother as another man severs his arms also still appeared in the Plaintiff's queue. He heard the young man's screams when he went home from work. He still hears them today, and wonders about the young man's mother, what she knows about her son's death.

76.     In quality assurance, the Plaintiff had to issue written opinions on his decisions. His work often interpreted standards involving terrorism, bestiality, animal cruelty, cannibalism, and child abuse. Moment by moment, he had to recount and describe the scenes in these videos as he articulated his judgments.

77.     The Plaintiff's relationship with his wife had strained, and escapism was often the only break from pain, even if it never fully went away. It was emotional, yes, but also physical. For reasons he could not understand, he often thought deeply about blood, bones, and pain in the videos he saw. He thought more deeply about his own disabilities, what they might look like if his body were to be opened and inspected. He felt physical pain as he entertained these thoughts. His posture changed; his body felt almost hunched, like he no longer had full physical control of himself.

78.    Over time, the Plaintiff began to recognize that Cognizant's content, and conduct, affected him, but he was unaware of the harm's permanence and degree. He believed that once he changed to a position where he was no longer exposed to the content, work and his life would improve. Stress and economic instability still affected his psychology. For him, professional help required capital, and his current situation provided him little to none.

79.    Defendant had a purported counselor sometimes at the office, but supervisors actively discouraged employees from consulting with them. Allotted time for wellness was 9 minutes per day.

80.    Almost 8 months into his work, the Plaintiff attempted to visit that mental health counselor at Cognizant. He hoped to begin a dialogue on his symptoms, to understand a possible diagnosis, to perhaps find tools to manage his physical and emotional pain.  During the visit, the counselor stated that they "did not know how to help" the Plaintiff. They provided him no diagnosis or strategies to move forward. Instead they apologized that he was "feeling the way he did."

81.    Immediately after the Plaintiff's first visit to the counselor, Mr. Molina began accosting him, asking why he was being "weak." He made statements like, "(m)eeting with a counselor would mean you would be gone too long to do the work." He often mentioned in conversations that the Plaintiff was "replaceable." For his part, the Plaintiff understood  these conversations as thinly

veiled threats to his employment, that Mr. Molina would orchestrate a red bag day for the Plaintiff if he continued to seek help.

82. Around this time, the Plaintiff also began to note that disability or difference was a source of humor for supervisors at the office. The lead supervisor, Ryan Moore, often made derogatory comments. He referred to one person in a company-wide meeting as "alligator arms." A woman with a colostomy bag was ridiculed and demeaned after she had an accident at work. Another woman who needed a walker for mobility was referred to as "sadder than people getting run over by cars in these Facebook videos."

83. Many disabled people were swept up in 'red-bag' days. The Plaintiff watched as this went on, he wondered what would happen to him.

84. Other workers at Cognizant suffered negative health outcomes. During an evening shift, an employee had a heart attack, and passed away while being subjected to videos and content. The office did not have a defibrillator. When the Plaintiff returned to work the next day, the Defendant attempted to misdirect inquiries, falsely claiming that his coworker had survived.

85. When the Plaintiff looks back at this time, he describes it as one where he was foundering in a pot of water. Without him knowing it, Cognizant had placed the pot on an oven burner with the setting on 'High.' By the time the water started to boil, it was too late. His psychology was grounded in trauma and scarcity. Fear and anxiety ruled his decisions. Pain, both physical and emotional, was a part of his everyday life. There was an awareness that he was struggling,

but he did not have a full grasp of where it began and how to address it. He had

no background or education in Traumatic Stress.

86.     Cognizant's representation that it provided counseling for employees

was, in practice, untrue and meaningless.

87.     As a disabled person, the Plaintiff knew his employment prospects

were limited (mostly by the judgment of others), so his main focus always had to

stay on his family. He felt like he just had to work, and that life would be better

once he worked hard enough to earn a different position.

88.     The Plaintiff did not know that Defendant had, upon information

and belief and at all times material, been aware of psychological studies

indicating that exposure to explicit, violent, and hateful content was extremely

dangerous to the psychological health of human beings. Facebook knew this (see

Paragraph 14), and part of its contract with Cognizant acknowledged it. The

Plaintiff was also unaware that Defendant, upon information and belief, was

using his work, and the work of others, to train AI via content labeling.

89.     Artificial Intelligence, specifically Machine Learning algorithms

(both Supervised and Unsupervised), can perform tasks such as content

moderation quickly, using specified or reinforced rules to address decisions

without the need for human input. It is, in Cognizant's parlance, scalable.

90.     For Machine Learning to accurately address content, it needs large

sets of labeled data from human decision-makers who generate verified,

agreed-upon judgments. Consensus from moderators is essential to counteract

bias, which assists an algorithm to address content long term. Machine Learning needs what software developers call 'ground truth.'

91.     With millions of daily posts, the algorithms need large quantities (likely in the millions) of training-data sets to moderate hate speech, violence, child abuse, terrorism, and more. Some objectionable content is easier for an algorithm to identify. For example, AI can scan pixels and images to determine nudity with a high degree of precision, while it can struggle to identify the specifics of child abuse or the motivations of a terrorist. It needs a prioritization tree – and labelers with specific cultural knowledge – to make millions of determinations before it can make meaningful 'progress.'

92.     Upon information and belief, the Defendant never disclosed that the reason its Process Executives kept seeing objectionable posts – each for at least 15 seconds – was to reinforce 'ground truth,' to train data for an algorithm essentially designed to replace human work.

93.     Cognizant used the decisions of Process Executives, including the Plaintiff, to train AI via content labeling.

94.     The Plaintiff had no knowledge that Cognizant (upon information and belief) was using Machine Learning as the touchstone for its processes, that Defendant connected its 'accuracy' metrics to eliminate 'bias' in data sets, that the video of a tortured young man crying for his mom had to be deleted for 'nudity' and not 'murder' because of an AI-related, data priority. The Defendant continued to show the Plaintiff videos of the same content for a reason — and it

was not for a lack of technological expertise. Upon information and belief, Cognizant needed its employees to generate an expansive data catalog. The Defendant wanted to train AI – and create valuable intellectual property from it – at immense expense to Process Executives like the Plaintiff. If the Plaintiff had known this, he would not have accepted this $15.00 per hour job.

95.    After several attempts to understand his feelings and the exact nature of his trauma, including more unhelpful attempts to consult with a counselor at the Cognizant office, the Plaintiff received a red bag in early 2019. Defendant's supervisors, including Mr. Molina and Alexander Kosharek, threatened the Plaintiff, stating that he "might never work in Tampa Bay again."

**Plaintiff's Diagnoses Post Employment with Cognizant**

96.    After his termination, the Plaintiff was essentially homeless with a family of 4.

97.    It was not until May of 2021 that Habitat for Humanity helped the Plaintiff and his family find shelter. The organization also supported the Plaintiff to find work. He moved forward, but still, he noticed his life and overall health were in a compromised place.  The Plaintiff had left the job at Cognizant, but the job at Cognizant did not leave him. He fortunately had the opportunity to work with a licensed mental health professional.

98.    In June of 2021 the Plaintiff began regular meetings with the licensed clinician. In December of that year, the provider diagnosed the Plaintiff with: Post-Traumatic Stress Disorder, Acute Stress Disorder, Trauma and Stress

Related Disorder, Generalized Anxiety Disorder, Depression, Migraine Disorder, Sleep Paralysis, Insomnia, Night Terrors, Arthritis, Chronic Pain Syndrome, ETOH Abuse, Chronic Pain Disorder, Agoraphobia (Severe Panic Disorder), Paranoid Disorder, and Avoidant Food Intake Disorder (Induced from Cannibalism Videos). The Plaintiff was unaware that he had suffered permanent trauma from Cognizant until his work with the clinician fully alerted him.

99.     Prior to his work at Cognizant, the Plaintiff described himself as a highly motivated and ambitious husband and father. The position as well as the content he saw at Cognizant took that from him. Today, the Plaintiff is a different person, and will never be the same after the emotional distress he endured as a result of the Defendant's conduct.

## PLAINTIFF'S CLAIM

### First Claim
### Fraudulent Misrepresentation (Florida Law)

100.    Plaintiff incorporates and re-alleges all allegations in Paragraphs 1-99.

101.    The Defendant, by and through its representatives, including Ms. Mennon, Mr. Williams, Mr. Lund, Mr. Knaak, and Mr. Lombardo, knowingly made false and misleading statements to Plaintiff concerning the nature and safety of his 'Process Executive' role. Cognizant also made false and misleading statements regarding the availability of mental health counseling.

102.    The Defendant and its representatives knew that the representations were false and misleading.

103.    The Defendant made all its misleading statements to induce the Plaintiff's employment and to keep him in its employ throughout his tenure.

104.    The Plaintiff reasonably relied on Defendant's false statements.

105.    As a result of Defendant's fraud, Plaintiff has been damaged, including actual, general, and special damages in amounts to be proven at trial.

106.    Plaintiff's special damages include lost wages, medical expenses, therapy expenses, medication expenses, and other expenses relating to his conditions and struggles associated with his time at Cognizant.

107.    As a result of all allegations recounted in this Complaint, the Plaintiff will seek compensatory damages, and reserves an opportunity, following factual discovery, to amend this Complaint and request punitive damages at trial.

Second Claim
Negligent Misrepresentation (Florida Law)

108.    The Plaintiff incorporates and re-alleges all allegations in Paragraphs 1-107.

109.    Under Florida law, the elements for Negligent Misrepresentation include: 1) an unknowingly false or misleading statement, 2) the Defendant should have known the statement was false or misleading, 3) the Defendant intended to induce the Plaintiff to act on it, 4) the Plaintiff reasonably relied on the statement, 5) resulting in damage.

110.    Even if Defendant and its representatives made statements without knowledge of their falsehood, they reasonably should have known the statements were false and misleading.

111.    Each of these statements were crafted to either engage or maintain the Plaintiff's employment.

112.    The Plaintiff reasonably relied on these statements, and made decisions based on their content.

113.    The Plaintiff suffered damages as outlined above and is entitled to recover such damages in amounts to be proven at trial.

<u>Third Claim</u>
<u>Intentional Infliction of Emotional Distress (Florida Law)</u>

114.    The Plaintiff incorporates and re-alleges all allegations in Paragraphs 1-113.

115.    Under Florida Law, the elements for Intentional Infliction of Emotional Distress include: 1) deliberate or reckless infliction of emotional suffering, 2) conduct deemed to be outrageous or intolerable in a civilized community, 3) the conduct caused the emotional distress, and 4) the distress was severe.

116.    The Defendant, by and through its representatives, deliberately and recklessly inflicted emotional distress on the Plaintiff. Cognizant disregarded necessary disclosure terms and psychological safeguards, then generated a dangerously manipulative environment that caused severe and damaging effects.

The Defendant knew that its Process Executives, including the Plaintiff, were
vulnerable people due to personal and economic insecurity, as well as the
certainty of psychological effects from its data labeling work.

117.    Cognizant leveraged this psychologically damaging environment,
and exploited its power, engaging in conduct that was both outrageous and
intolerable in a civilized community. It has since closed all content operations in
Tampa, and moved to other States and other countries. It currently remains a
'Fortune 500' company, seeking opportunities for 'scalability' when it comes to AI
and its business use.

118.    The conduct caused the Plaintiff severe emotional distress, including
lasting psychological and physiological effects.

119.    The Plaintiff's distress is severe. He suffers from Post-Traumatic
Stress Disorder, Acute Stress Disorder, Trauma and Stress Related Disorder,
Generalized Anxiety Disorder, Depression, Migraine Disorder, Sleep Paralysis,
Insomnia, Night Terrors, Arthritis, Chronic Pain Syndrome, ETOH Abuse,
Chronic Pain Disorder, Agoraphobia (Severe Panic Disorder), Paranoid Disorder,
and Avoidant Food Intake Disorder (Induced from Cannibalism Videos). But that
just doesn't fully capture it. The Plaintiff can never be the same again after seeing
thousands of murders, rapes, suicides, deaths, instances of child abuse and more.
His life – and by extension the lives of his children– will be forever changed by
this.

## **DEMAND FOR JURY TRIAL**

120.    Plaintiff demands a trial by jury in this matter.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests this Court grant Plaintiff

the following relief:

1)    Judgment in his favor and against Defendant;

2)    An award of actual, compensatory (including emotional distress/loss of

enjoyment of life), general, and exemplary damages in amounts to be proven at

trial;

3)    An award of special damages, including lost pay, medical expenses, and

lost future earning capacity;

4)    Taxation of attorneys fees and costs against Defendant; AND

5)    Such other relief as this Court deems just and equitable.

Respectfully Submitted,


/s/ Christopher Lovelady
Christopher Lovelady, Esq
Attorney for Plaintiff
FBN: 0852821
8386 66th Way
Pinellas Park, FL 33781
727-430-4137
cmlovelady@aol.com


October ___, 2024
Pinellas Park, Florida